UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WILLOW INTERNATIONAL, INC.,** <br><br> Plaintiff, <br><br> v. <br><br> **THE STANDARD CASING COMPANY, INC.,** <br><br> Defendant. | Civ. No. 2:12-1767 (KM)(MCA) <br><br> **OPINION** |

## KEVIN MCNULTY, U.S.D.J.:

Before this Court is an unopposed Motion for Summary Judgment filed by the plaintiff, Willow International, Inc. ("Willow"), against the defendant, The Standard Casing Company, Inc. ("Standard"). I have carefully reviewed Willow's submissions, which demonstrate that Willow is entitled to judgment as a matter of law.

Willow asserts two claims: breach of contract and unjust enrichment. Willow's statement of undisputed facts and supporting materials demonstrate that Willow, as purchaser, and Standard, as supplier, entered into a valid and enforceable supply contract for natural sausage casings. At Standard's request, Willow entrusted Standard with a deposit of cash that was to serve as an "evergreen" retainer. Standard was thus secured against the risk of nonpayment, while Willow was guaranteed product availability and favorable pricing. The parties' course of behavior establishes that they intended the deposit to be refundable, and there is no evidence that it was non-refundable. Standard's failure to return the deposit thus constitutes a breach of contract, entitling Willow to judgment as a matter of law. In the alternative, Standard's retention of the deposit is inequitable, and Willow is entitled to judgment under a theory of unjust enrichment. Judgment will be entered in favor of Willow.

## I. PROCEDURAL BACKGROUND

Willow, a Turks and Caicos corporation, is an agent that facilitates the sale of food products to end-users and distributors in Eastern Europe and

Russia. Standard, a New Jersey corporation, is a supplier of natural sausage casings.

After the parties' relationship fell apart, Willow commenced this action on March 21, 2012. Docket No. 1 ("Compl."). Defendant initially defaulted, Docket No. 6, but subsequently appeared and filed an answer. Docket No. 7. Willow consented to vacating the default. Docket No. 12.

Following discovery, Judge Arleo set a briefing schedule for summary judgment motions. Willow filed this motion for summary judgment on March 1, 2013. The return date was set for May 6, 2013. Standard did not file an opposition brief.

By Text Order dated November 20, 2013, the Court advised Standard that, if no opposition was filed by December 9, 2013, Willow's summary judgment motion would be considered unopposed. Docket No. 25. To date, no such opposition has been filed.

## II. DISCUSSION

This matter is properly before this Court pursuant to 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy exceeds $75,000. I will apply New Jersey substantive law to Willow's breach of contract and unjust enrichment claims. *See generally Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). Federal law supplies the procedural standards governing summary judgment.

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248; *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

Where, as here, a party fails to address the other party's properly supported assertion of fact, the court may consider "grant[ing] summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e). Local Civil Rule 56.1(a) deems a movant's statement of material facts undisputed where a party does not respond or file a counterstatement. L. Civ. R. 56(a). A failure to dispute a party's statement of material facts, however, "is not alone a sufficient basis for the entry of a summary judgment." *See Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990) (holding that even where a local rule deeming unopposed motions to be conceded, the court was still required to analyze the movant's summary judgment motion under the standard prescribed by Fed. R. Civ. P. 56(e)); *see also Muskett v. Certegy Check Servs., Inc.*, Civ. No. 08-3975, 2010 WL 2710555 (D.N.J. July 6, 2010) ("In order to grant Defendant's unopposed motion for summary judgment, where, as here, 'the moving party does not have the burden of proof on the relevant issues, . . . the [Court] must determine that the deficiencies in [Plaintiff's] evidence designated in or in connection with the motion entitle the [Defendants] to judgment as a matter of law.'" (quoting *Anchorage Assocs.*, 922 F.2d at 175)).

B. Willow's Statement of Undisputed Facts

Willow, in accordance with Local Rule 56.1(a), has filed a Statement of Undisputed Material Facts, supported by relevant affidavits and exhibits. Docket No. 22. Its factual contentions are as follows.

The parties were in a contractual relationship as purchaser and supplier. After some preliminary communications, Willow placed its first order for sausage casings with Standard in February 2005. Docket No. 22-4 (Exhibit B at 4). The terms of the initial order required Willow to pay "50% of the cost of the barrels on receipt of correct documentation [and] 50% within 7 business days of satisfactory receipt of product in Moscow." *Id.* at 5. Willow placed its next order on August 30, 2005 and also placed orders in November 2005, December 2005, and March 2006. *Id.* at 18, 24, 33, 46. Then, in March, May, and November 2006, Willow and Standard representatives met to discuss options for future orders. According to Standard President Michael Koss's notes, during the November 2006 meeting, Koss and Willow Representative Asher Svirsky discussed an option whereby Willow would leave a "permanent deposit of $150,000 and pay each invoice after shipment." *Id.* at 76. Svirsky agreed to this arrangement and Koss agreed to give Willow a 2% discount in return. *Id.*

Beginning in 2007, at Standard's request and in consonance with the agreement that had been reached, Willow advanced funds as a "permanent deposit" in exchange for Standard's guarantee of future availability of its product at favorable pricing. Docket No. 22-1 at 4. Willow first paid a deposit of $150,000 on January 3, 2007. That sum was reflected in Standard's books as a "deposit." Docket No. 22-1 at 4–5. Willow paid an additional deposit of $150,000 on August 31, 2007. *Id.* At Standard's request, on October 4, 2007, Willow paid an additional deposit of $350,000. *Id.* at 6.

Willow refers to these sums as an "evergreen" or "permanent" deposit, in the nature of a security deposit or retainer. Willow separately paid each invoice issued by Standard, without drawing down on the deposit. Further, Willow "always understood that the deposit was refundable, and never would have agreed to Standard's request for a deposit if it was not." *Id.* at ¶ 45.

Standard has claimed that the parties did not reach any agreement with respect to refundability. *Id.* at ¶ 46. Moreover, the companies did not agree to terms, such as a minimum amount of time that Willow would keep the deposit with Standard or a minimum required level of purchases. *Id.* at ¶ 47.

Citing a lack of market demand and import issues, on November 30, 2009, Willow advised Standard that it was ceasing all orders. *Id.* at ¶¶ 49, 55.

In the months to follow, Standard made several attempts to entice Willow to place additional orders, but Willow did not.

In a November 2010 email, Willow first requested that Standard return the deposit. In response to this email, Standard President Michael Koss "acknowledge[d] that we are still holding the advance," but noted that it was "difficult for us to reduce that unless we can sell out inventory and future production." *Id.* at 8. Standard proposed that Willow keep placing orders, and stated that Standard would repay 10% of the invoice value of each order until the "advance has been fully repaid." Willow rejected that proposal. *Id.*

Further discussions of repayment of the deposit followed. The parties agreed that Standard would make an initial, partial repayment of $30,000. *Id.* Koss confirmed, via email correspondence, a discussion between a Willow representative, Asher Svirsky, and himself in which the two men "discussed the outstanding 650 k dollars." The two agreed that the "first payment will be 30k" and that Willow would then "expect additional payments" in order to "reduce the principal amount in a timely fashion." *Id.* at 8–9; Docket No. 22-3 (Exhibit 14 at Willow 0037).

As agreed, Standard paid back $30,000 on March 24, 2011. On July 28, 2011, Standard repaid a second instalment of $30,000. After further inquiry by Willow, on September 19, 2011, Standard made a third instalment payment of $30,000. Docket No. 22-1 at 9. This was the last repayment instalment received. Thus the total repayment was $90,000; the deposit balance of $650,000 had been reduced to $560,000.

On September 29, 2011, Willow informed Standard that it was suspending new orders indefinitely. *Id.* at 9. Willow continued to request information regarding a repayment schedule. Standard replied, not that it did not owe the money, but that it lacked the financial means to repay. *Id.* at 10. Later, at a January 2012 meeting, Koss agreed that Willow could place orders against which Standard would credit the full amount of the deposit. Willow then attempted to place orders for $560,000 worth of casings, but Standard declined to fill the orders. *Id.*

C. Breach of Contract

Under New Jersey law, to prove a breach of contract claim, a plaintiff must demonstrate the existence of a valid contract; that the defendant failed to perform under the contract; and that plaintiff sustained damages as a result. *Red Roof Franchising, LLC v. Patel*, 877 F.Supp.2d 124, 132 (D.N.J. 2012) (citing *Murphy v. Implicito*, 392 N.J. Super. 245, 265, 920 A.2d 678, 689 (App. Div. 2007). Here, Willow and Standard stood in the contractual relation of

5

purchaser and seller, a relation amply evidenced by orders, invoices and other communications. Another part of that contractual arrangement, however, was the ongoing agreement whereby Willow entrusted Standard with a cash deposit, eventually amounting to $650,000. Because Willow paid each invoice as it came due, the deposit did not decline; it functioned as an "evergreen," or permanent, retainer. What Standard got was security and working capital to order raw material and produce product. What Willow got was Standard's assurance that the product would be available and a 2% price discount. For the reasons stated below, I find that this was a valid and enforceable contract. It is undisputed that Willow performed its obligations, *i.e.*, that it deposited $650,000 with Standard and never failed to pay an invoice. Willow exercised its right to terminate the contract, which had no fixed term. Therefore, as Willow contends, Standard breached this contract by failing to return the remaining $560,000 balance.

Under Local Civil Rule 56.1(a), Willow's properly supported statement of material facts is deemed to be undisputed because Standard has failed to respond or file a counterstatement. *See* L. Civ. R. 56(a). Standard's failure to dispute Willow's statement of material facts, however, "is not alone a sufficient basis for the entry of a summary judgment." *See Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990). Guided by Fed. R. Civ. P. 56(e), I have carefully reviewed Willow's Summary Judgment Motion and supporting materials in order to determine whether they establish an entitlement to judgment as a matter of law.

The testimonial and documentary evidence easily suffices to establish the existence of the claimed contract. The parties, already in a purchaser/supplier relationship, had a meeting regarding future business involvement. The record contains an email from Standard's President, Koss, to a Willow representative, Svirsky, stating that "it would be far easier for us to have a permanent deposit on hand and then to invoice you after shipment, when you can pay that particular shipment invoice (with a 2% discount)." Docket No. 22-2 at 12; Docket No. 22-5 (Exhibit E at Willow 00077). Standard admits that it received the deposit in three instalments. Docket No. 22-5, Exhibits C and D ("First Set of Requests for Admission to Defendant The Standard Casing Company, Inc.") at ¶¶ 4–6. Willow advanced the deposit to Standard, initially in the amount of $150,000, but eventually in at total amount of $650,000. Standard filled Willow's orders and gave Willow the promised 2% discount. Where parties agree on "essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435, 608 A.2d 280, 284 (N.J. 1992). That happened here.

6

I also find that Willow has shown that Standard breached this contract by refusing to return the deposit in full upon Willow's request, resulting in injury to Willow. Willow argues that its agreement contained no provision concerning duration or termination and was thus terminable at will by either party. *See In re Miller's Estate*, 90 N.J. 210, 219 (N.J. 1982) ("Ordinarily, if a contract contains no express terms as to its duration, it is terminable at will or after a reasonable time."). In any event, it is clear from the record that Willow was flexible in allowing Standard time to return the deposit.[1]

Willow asserts that it believed the deposit to be refundable and that it would not have agreed to a non-refundable deposit. The statements and conduct of the parties confirm Willow's reasonable belief; there is no genuine, material issue of fact on this point. When Willow notified Standard of the termination of the agreement and requested payment of the advance, Standard did not reply that the deposit was non-refundable. Rather, Koss acknowledged that Standard was still holding the advance, but proposed that it would repay 10% of the invoice value of each order placed by Willow "until such time at the advance has been fully repaid." Docket No. 22-5 (Exhibit K at Willow 00328). In this correspondence, Koss describes the deposit as "the advance that you generously provided." *Id.* Moreover, Koss testified that the "only" reason for the non-repayment was the company's perilous financial position. Docket No. 22-4, Exhibit A ("Koss Deposition") at 12:16–17. And in fact, Standard returned $90,000 of the deposit. Asked why this partial repayment was made if Standard had no obligation to return the deposit, Koss had no cogent response. He stated only that he had "agreed to it." Koss Deposition at 41:5–12.

The strongest case that can be made, from Standard's point of view, is that the parties did not explicitly settle the issue either way. Koss, in his deposition, stated that the parties never discussed refundability. Koss Deposition at 26:20–27:2. That contention is insufficient as a matter of law to overcome Willow's showing.

For example, *Corestar Int. Pte. Ltd. v. LPB Communications, Inc.*, holds, and I agree, that in the absence of any specific agreement, Standard would have to establish that Willow was made aware that the deposit was non-

---

[1] The parties' agreement is silent on the matter, but it might be fair to infer a "reasonable time" term. That is, after Willow made demand, Standard might have been given a reasonable time to extricate itself from pending financial arrangements and return the deposit. Such an implied term would not affect the result here. Standard last paid an instalment in September 2011. It negotiated with Willow but never proposed a reasonable repayment schedule. Standard's final offer was to repay the deposit *via* credits against future orders, but it promptly dishonored that arrangement.

7

refundable. 513 F. Supp. 2d 107, 119–20. (D.N.J. 2007). In *Corestar*, the defendant argued that it had a standard policy that all deposits were non-refundable and that plaintiff, having dealt with the company for some time, should have known that. *Id.* That "policy," however, was not reflected in the quotation provided to plaintiff. The defendant failed to offer proof that the policy was a "known course of performance between the parties or standard industry practice." *Id.* Because the defendant had the "burden of proving that a course of dealing existed between the parties," the court concluded that the "defendant's contention that the plaintiff's seventy-five percent deposit was non-refundable must fail and not be considered part of the contract." *Id.* The court, therefore, granted summary judgment for breach of contract in favor of the plaintiff. *Id.* at 124.

The *Corestar* holding fits the facts here. Willow has offered testimony that it believed that the deposit was refundable, and I find that belief to be commercially reasonable in light of the nature and purpose of the deposit. The deposit arrangement was a substitute for the requirement of 50% payment in advance, but it did not relieve Willow of the obligation to pay each invoice. There is no evidence that any Standard representative ever communicated to Willow that the deposit was intended to be non-refundable. Koss's testimony establishes, at best, that the parties' agreement was silent on the point. There is no evidence of an industry standard or practice from which Willow could have inferred that the deposit was non-refundable. Under *Corestar*, that is sufficient to establish as a matter of law that the deposit must be considered refundable.

Even assuming that Koss, or anyone at Standard, actually thought the deposit was non-refundable (and all evidence is to the contrary), that subjective intent would be irrelevant as a matter of New Jersey law. A "contracting party is bound by the apparent intention he or she outwardly manifests to the other party. It is immaterial that he or she has a different, secret intention from that outwardly manifested." *Tung v. Briant Park Homes, Inc.*, 287 N.J. Super. 232, 239, 670 A.2d 1092 (App. Div. 1996). No one at Standard ever stated that the deposit was non-refundable. And, in response to Willow's many requests for repayment, Standard never objected on the basis that the deposit was non-refundable. Indeed, Standard partially repaid the deposit, in three instalments of $30,000 each.

There is no genuine, material issue of fact that stands in the way of entry of judgment in Willow's favor on its claim of breach of contract. All of the evidence is that the parties were in a contractual relationship. Part of that contract involved Willow's furnishing a refundable evergreen deposit of

$650,000 to ensure product availability and favorable pricing. There is no dispute that Willow advanced $650,000 to Standard under this agreement and that Standard returned only $90,000. Standard's failure to repay the remaining balance of $560,000 was therefore a breach of contract.

D. Unjust Enrichment

In the alternative, even if there were no binding and valid contract, Willow would be entitled to return of its deposit under the theory of unjust enrichment. "[W]here a debt is not evidenced by a legally valid contract, a quasi-contract (or contract implied in law) may support recovery." *Schecter v. Schecter*, CIV.A. 07-419 (KSH), 2008 WL 5054343, *6 (D.N.J. Nov. 26, 2008). The New Jersey Supreme Court has reasoned that "a contract action implied-in-law is a restitutionary claim. Like the equitable doctrine of restitution, the key element of a quasi-contract claim is that one party has been unjustly enriched at the expense of another. Recovery under both doctrines is typically measured by the amount the defendant has benefitted from the plaintiff's performance." *Wanaque Borough Sewerage Auth. v. Twp. of W. Milford*, 144 N.J. 564, 575, 677 A.2d 747 (N.J. 1996).

> In a truer sense the court can force the fictionally breaching party (i.e., the enriched party) to perform; the performance required is to compensate the injured party. . . . [T]here are only two "essential elements" of a contract implied in law: "(1) that the defendant has received a benefit from the plaintiff", and "(2) that the retention of the benefit by the defendant is inequitable."

*Id.* (quoting Judy Beckner Sloan, *Quantum Meruit: Residual Equity in Law*, 42 DePaul L.Rev. 399, 408 (1992)).

Here, these two essential elements necessary to find a contract implied in law are met. In particular, (1) Standard received the benefit of the deposit provided by Willow and (2) Standard's retention of the benefit would be inequitable.

Even if Willow had been mistaken as to the refundability of the deposit – which, to be clear, I do not find – such a mistake would have been reasonable under the circumstances. Indeed, such a mistake could just as reasonably be blamed on Standard, given the statements and actions described above. "It is considered unjust enrichment to permit the recipient of money paid under mistake of fact to keep it, unless the circumstances are such that it would be inequitable to require its return." *PaineWebber, Inc. v. Levy*, 293 N.J. Super. 325, 327, 680 A.2d 798, 799 (Ch. Div. 1995) (citing *Great American Ins. Co. v. Yellen*, 58 N.J. Super. 240, 156 A.2d 36 (App. Div. 1959)). A party who has

paid money under a mistake of fact may be entitled to restitution even where the mistake is unilateral "and a consequence of the payor's negligence, unless such restitution will prejudice the payee." *Id.* "Prejudice to the payee does not occur when the payee has used the money to cover ordinary living expenses or to pay preexisting debt." *Id.* Therefore, even assuming that Willow was unilaterally mistaken as to the refundability of the deposit, Standard's alleged financial troubles could not be attributed to any wrongful act by Willow, and they would not constitute the kind of prejudice that would preclude recoupment.

In sum, Willow paid Standard the deposit with the understanding that it was to be used as security against future orders and would be refundable. By retaining the deposit, Standard has unjustly enriched itself. It would be inequitable to allow Standard to keep the unreturned balance of the deposit. Accordingly, even in the absence of a valid and enforceable contract, I would award Willow judgment for the $560,000 balance on an unjust enrichment theory.

E. <u>Interest</u>

Willow has requested that any judgment in its favor include prejudgment interest from November 29, 2010, the date it first requested that the deposit be returned, plus statutory costs and fees. I will grant Willow's request for pre-judgment interest, but only starting from September 20, 2011, the date on which Standard made its last $30,000 repayment to Willow. *See* Docket No. 22-1 at ¶¶ 68–69.

New Jersey law governs this Court's ability to award pre-judgment interest. *See Jarvis v. Johnson*, 668 F.2d 740, 748 (3d Cir. 1982) (affirming a district court ruling that the New Jersey pre-judgment interest rule had to be applied in federal court under *Erie*). Pre-judgment interest "on contract and equitable claims is based on equitable principles," and lies within the court's discretion. *County of Essex v. First Union Nat. Bank*, 186 N.J. 46, 61, 891 A.2d 600, 608 (2006). The district court may exercise this discretion based upon "considerations of fairness," and an award of prejudgment interest may be denied "when its exaction would be inequitable." *Thabault v. Chait*, 541 F.3d 512, 533 (3d Cir. 2008) (quoting *Ambromovage v. United Mine Workers of Am.*, 726 F.2d 972, 982 (3d Cir. 1984)). Under New Jersey law, "the purpose of prejudgment interest is to 'compensate the plaintiff for the loss of income that would have been earned on the judgment had it been paid earlier.'" *Id.* (quoting *Ruff v. Weintraub*, 105 N.J. 233, 245, 519 A.2d 1384, 1390 (1987)).

Here, Willow was entitled to the return of its deposit within a reasonable time of its demand, and should have had the benefit of the funds since then. Willow made demand on November 29, 2010, but I do not find it equitable to award interest from that date. The parties continued to negotiate, and Standard did make three $30,000 payments, the last of them on September 20, 2011, bringing the deposit balance down to $560,000. Its retention of the balance became unequivocally wrongful as of that date. Accordingly, I find it appropriate to award Willow prejudgment interest on the sum of $560,000, running from September 20, 2011, at the applicable state rate.

Willow has requested "fees." If by that it means attorney's fees, the request is denied. I see no contractual or statutory basis for an award of fees in this ordinary contract action, and, absent such a basis, New Jersey law does not permit an award of fees. *Litton Indus., Inc. v. IMO Indus., Inc.*, 200 N.J. 372, 385, 982 A.2d 420, 427 (N.J. 2009) (citations omitted) (reasoning that New Jersey disfavors the shifting of attorneys' fees, which may be recovered only "if they are expressly provided for by statute, court rule, or contract").

Customary court costs will be awarded. Willow may submit a bill of costs to the Clerk pursuant to Local Rule 54.1.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment in the amount of $560,000 plus prejudgment interest, is **GRANTED**. An appropriate order will be filed with this opinion. The plaintiff shall, within seven days, submit a form of judgment to the Court, and defendant will have an additional seven days to submit any objections to the form of judgment.

*[signature]*
**KEVIN MCNULTY**
**United States District Judge**